**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

KEONDRA M. CHESTANG                                                    PLAINTIFF
ADC #134005

V.                                     NO: 5:15CV00080 SWW/PSH

MISSALLY S. SIMPSON *et al*                                          DEFENDANTS

## PROPOSED FINDINGS AND RECOMMENDATION

## INSTRUCTIONS

The following Proposed Findings and Recommendation have been sent to United States District Judge Susan W. Wright.  You may file written objections to all or part of this Recommendation.  If you do so, those objections must:  (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation.  By not objecting, you may waive the right to appeal questions of fact.

## DISPOSITION

### I.  Relevant facts

Plaintiff KeOndra M. Chestang, an inmate at the Varner Super Max Unit (VSM) of the Arkansas Department of Correction (ADC), filed a *pro se* complaint on March 11, 2015. Defendants are VSM, Correctional Officer Missally S. Simpson, ADC Medical Director Rory Griffin, and VSM Sgt. David Quillen (ADC defendants); and nurse Aleeshia Quinones, Director of Nursing Teri Kennedy, Assistant Director of Nursing Lesa Jones, and Dr. Ojiugo Iko (medical defendants). Specifically, Chestang alleges the following in his complaint:

1

On the date of August 30, 2014, Mr. Chestang began to endure more complications with his blood pressure like head pounding; blurred vision; chest pains, etc. At about 1:50 p.m. Ofc. Ms. Simpson contacted Sgt. Mr. Quillen.  About 2:00 p.m. Sgt. Mr. Quillen came to my cell door to reaffirm the issue then, he left.  My symptoms continued and about 2:20 p.m. Ofc. Ms. Simpson called VSM control to advise I was short of breath.  Then about 2:25 p.m. Ofc. Ms. Simpson advised me the nurse, Ms. Q will come see me, after she does pill call.  About 2:30 p.m. an unidentified nurse came to my cell door to take my pulse.  It was 3:00 p.m. when Ofc.(s) finally came to escort me to the infirmary for an E.K.G., vital signs, i.e., etc.  Which was 143/88 pulse 91.  This was all likely correlated to the deprivation of my medication for blood pressure for an extended period by staff(s), Director of Nurses (D.O.N.), Kennedy, Assistant Director of Nurses (A.D.O.N.), Jones, ADOC Medical Director Griffin; and Correct Care Solutions owner, Humphrey for deliberate indifferences, i.e. in lack of quality management, care and/or the proper training for themselves and their subordinates, and sufficient supervision and enforcement of orders administrative or otherwise.  (See, grievance #VSM 14-03468).

Chestang asserts the symptoms he described arose after he went without his blood pressure medication for two to three weeks.[1]

Simpson and Quillen are guards who were on duty on August 30, 2014, when Chestang began having chest pains.  Chestang asserts Griffin, a supervisor, failed to implement policies, and train and manage subordinates, in a way to ensure quality medical care for inmates.  Chestang claims nurse Quinones was on duty on August 30, 2014, but continued dispensing medications instead of responding to a call to assist him when he began having the chest pains.  Chestang alleges Kennedy, Jones, and Iko failed to take corrective action when he was not receiving his blood pressure medications.  Kennedy and Jones allegedly had access to records which, Chestang maintains, would have shown them that he was being deprived of medications.  Iko saw Chestang for his chest pains.

On July 19, 2016, the ADC defendants filed a motion for summary judgment, a brief in support, and a statement of facts on the merits of the case.  Doc. Nos. 126-128.  Chestang filed a

---

[1]Chestang was prescribed aspirin and Atenolol.  Doc. No. 138-2, page 1.

response in opposition, brief in support, and statement of facts on July 27, 2016.  Doc. Nos. 131-133.
On August 12, 2016, the medical defendants filed a motion for summary judgment, a brief in
support, and a statement of facts on exhaustion as to Jones and Kennedy, and on the merits of the
case as to all.  Doc. Nos. 136-138.  Chestang filed a response, brief in support, and statement of facts
on September 8, 2016.  Doc. Nos. 142 & 143.  For the reasons set forth below, the Court
recommends that the motions for summary judgment on the merits of the case be granted.

## II.  Standard of review

Summary judgment is only appropriate "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter
of law."  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The Court must
view the facts, and inferences to be drawn from those facts, in the light most favorable to the
nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).
A moving party is entitled to summary judgment if the nonmoving party has failed to make a
showing sufficient to establish the existence of an element essential to that party's case.  *Celotex*,
477 U.S. at 322-23. The Eighth Circuit has held that "[o]nly disputes over facts that might affect the
outcome of the suit under the governing law will properly preclude the entry of summary judgment."
*Dulany v. Carnahan*, 132 F.3d 1234, 1237 (8th Cir. 1997) (quoting *Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 248 (1986)).

## III.  Analysis

The ADC defendants assert they are entitled to summary judgment because they were not
deliberately indifferent to Chestang's medical needs.  The medical defendants claim they are entitled

to summary judgment because Chestang failed to exhaust his administrative remedies as to Kennedy and Jones before he filed his lawsuit, and because none of them were deliberately indifferent to his serious medical needs.

<u>ADC defendants</u>

The Eighth Amendment's proscription of cruel and unusual punishment obligates prison officials to provide adequate medical care to inmates in their custody. *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976). To succeed with an inadequate medical care claim, a plaintiff must allege and prove that: (1) he had objectively serious medical needs; and (2) prison officials subjectively knew of, but deliberately disregarded, those serious medical needs. *Dulany v. Carnahan*, 132 F.3d at 1239. Additionally, the Eighth Circuit has held that a "prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995).

**Defendants Simpson and Quillen**

Chestang's claims against Simpson and Quillen are not extensive. According to the complaint, Chestang began having chest pain and other symptoms at about 1:50 p.m. on August 30, 2014. Chestang testified in his deposition that he reported his symptoms to Simpson, and she said she would make a call about the situation. Doc. No. 126-2, page 3. Chestang's testimony indicates he told Simpson at that time that he was out of medication, but had not told her previously. Doc. No. 126-2, pages 3-4. Chestang stated that he and Simpson had "a decent professional relationship," that she "is the type of officer that usually does her job," and if he needed something, "she usually makes sure that I get it." Doc. No. 126-2, pages 2-3. Simpson made a call, and about 10-15 minutes

later Quillen came to Chestang's cell.  Chestang testified that he told Quillen of his symptoms, but never specially told Quillen he was out of medication.  Doc. No. 126-2, pages 4-5.  Records indicate nurse Armaster, a non-party, arrived at 2:20 p.m. to evaluate Chestang, Doc. No. 126-1, page 1, and he was escorted to the infirmary for more testing about 30 minutes later.  Chestang testified that his pain was almost gone by the time he arrived at the infirmary.  Doc. No. 126-2, page 6.

The undisputed facts demonstrate that neither Simpson nor Quillen was deliberately indifferent to Chestang's medical needs.  In fact, the evidence establishes just the opposite.  Chestang's testimony and security records establish Simpson and Quillen reported Chestang's complaints promptly to medical staff, and that a nurse arrived at his cell within 30 minutes of Chestang's first contact with Simpson.  Doc. No. 2, page 6; Doc. No. 126-1, page 1.  Thereafter, Chestang was taken for further treatment.  There was no deliberate indifference.

Even if Chestang could prove deliberate indifference on the part of Simpson and Quillen, he has failed to offer medical evidence to establish that he suffered any injury as a result of a 30 minute delay from the time he first reported the symptoms until the time he was seen by a nurse.  *See Coleman v. Rahja*, 114 F.3d 778, 784 (8th Cir. 1997)(when an inmate alleges that a delay in medical care constitutes a constitutional violation, he must allege, and eventually place in the record, verifying medical evidence establishing the detrimental effect of the delay).  *See also Johnson v. Hamilton*, 452 F.3d 967, 972-73 (8th Cir. 2006)(one month delay in treating fractured finger did not rise to a constitutional violation); *Jenkins v. County of Hennepin, Minn.*, 557 F.3d 628, 633 (8th Cir. 2009) (constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish).

5

**Defendant Griffin**

Chestang asserts that Griffin is, along with others, responsible for his blood pressure medication running out before the events of August 30, 2014. Chestang's allegations against Griffin are that he reviewed grievances in which Chestang complained that he was not receiving his blood pressure medication, failed to take corrective action, and failed to train staff members or implement policies to ensure quality care.  Griffin did review Chestang's grievances, and found them to be with merit.  Doc. No. 126-5.  Notably, however, the grievances Griffin found to be with merit were not received by him until after August 30, 2014.  Thus, Griffin was not aware of the problem and able to correct it before the incident at issue in this complaint.[2]

Additionally, Griffin did not ignore the problems identified in the grievances.  In fact, Griffin required the medical provider to submit a performance improvement plan.  That plan is attached to the ADC defendants' motion.  Doc. No. 126-5, pages 2 & 8-9.  Griffin's efforts to address these problems do not support a finding of deliberate indifference to a serious medical need.

Chestang also claims Griffin failed to train his subordinate staff members.  As discussed above, neither Simpson nor Quillen was deliberately indifferent to Chestang's medical needs.  Therefore, Chestang cannot prevail on a failure to train claim against Griffin.  *See Carpenter v. Gage*, 686 F.3d 644, 651 (8th Cir. 2012) (holding that a plaintiff cannot proceed with a failure to train claim when there has been no underlying constitutional violation).

<u>Medical defendants</u>

Defendants Kennedy and Jones argue they are entitled to summary judgment because Chestang failed to fully exhaust any administrative remedies that identified them and which related

---

[2]None of the medical grievances Chestang fully exhausted during the relevant time period were appealed to Griffin before the events of August 30, 2014.  Doc. No. 138-1.

to the ordering, delivering, and distribution of medications, and the maintenance of medical records. All of the medical defendants contend they were not deliberately indifferent to Chestang's serious medical needs.

## Exhaustion - Kennedy and Jones

The Prison Litigation Reform Act (PLRA) requires an inmate to exhaust prison grievance procedures before filing suit in federal court. *See* 42 U.S.C. §1997e(a); *Jones v. Bock*, 549 U.S. 199, 202 (2007); *Jones v. Norris*, 310 F.3d 610, 612 (8th Cir. 2002). Exhaustion under the PLRA is mandatory. *Jones v. Bock*, 549 U.S. at 211. The PLRA's exhaustion requirement applies to all inmate suits about prison life whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The PLRA does not prescribe the manner in which exhaustion occurs. *See Jones v. Bock*, 549 U.S. at 922-923. It merely requires compliance with prison grievance procedures to properly exhaust. *See id.* at 922-23. Thus, the question as to whether an inmate has properly exhausted administrative remedies will depend on the specifics of that particular prison's grievance policy. *See id.* at 923-924. The ADC's grievance policy requires inmates to be specific concerning the substance of the issue complained about as well as the date, place, personnel involved, and witnesses. Doc. No. 138-1, pages 7, 8, 21.

According to Shelly Byers, the ADC's Medical Grievance Coordinator, Chestang fully exhausted eight grievances from August 1, 2014, to the date he filed his complaint. One of those grievances is VSM-14-03468, in which Chestang described the symptoms he experienced on August 30, 2014, and complained:

> This was all likely correlated to the deprivation of my meds for blood pressure (which was 143/88 pulse 91) for an extended period by staffer/D.O.N. Kennedy; A.D.O.N. Jones; ADC Medical Director Griffin; and Correct Care Solutions...in lack of quality management care and/or training for themselves and subordinates, and sufficient supervision & enforcement.

*See* Doc. No. 138-1, page 28.

Although the medical defendants claim the grievance does not allege Kennedy and Jones failed to order, deliver, or distribute Chestang's medications, it specifically mentions Kennedy and Jones, and sufficiently describes the issues in the complaint to establish exhaustion as to his claims against Kennedy and Jones.[3]   Accordingly, the medical defendants have not met their burden of proving Chestang failed to exhaust his administrative remedies as to Kennedy and Jones before he filed his lawsuit.

## Deliberate indifference - Quinones, Kennedy, Jones, and Iko

The medical defendants also contend they were not deliberately indifferent to Chestang's serious medical needs.  According to Chestang's deposition testimony, he named Quinones because Simpson told him she would call "Nurse Q" for assistance when he began having his cardiac symptoms.[4]   Chestang asserts Quinones was deliberately indifferent to his serious medical needs because she prioritized pill call over his emergency situation.  Doc. No. 138-7, page 4.  Although there appears to be some question as to whether Quinones was ever contacted, the issue is not dispositive.  As discussed above, nurse Armaster arrived at Chestang's cell within 10-15 minutes of Simpson's call, and escorted Chestang to the infirmary shortly thereafter.  Doc. No. 126-1, page 1.  There is no constitutional violation.

---

[3]Chestang also referenced Kennedy and Jones in grievance VSM-14-03469.

[4]"Nurse Q" is apparently Quinones.

Even assuming Chestang could demonstrate that Quinones could have reached him more quickly than Armaster, he cannot establish any resulting injury.  As with defendants Simpson and Quillen, Chestang could at most demonstrate a brief delay in medical care, but he has not offered any medical evidence of any detrimental effect of the delay.  *See Coleman v. Rahja*, 114 F.3d at 784 (medical evidence required to establish detrimental effect of delay in provision of medical care).  Conversely, the medical defendants have submitted the declaration of a physician who concluded even if there was a delay in providing the initial care, the care was medically appropriate, and Chestang suffered no harm as a result.  Doc. No. 138-3, page 1.  In the face of medical records indicating that treatment was provided, and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that he does not believe he received adequate treatment.  *Dulany v. Carnahan*, 132 F.3d at 1240.  No material facts are in dispute, Chestang has failed to meet proof with proof, and Quinones is entitled to summary judgment.

Chestang's claim against the other three medical defendants, Kennedy, Jones, and Iko, is that they contributed to the incident by their earlier corrective inaction.  Chestang claims Kennedy and Jones were on notice of his medication problems when he filed grievances and requests for interviews, which were then entered into the Electronic Offender Management Information System (EOMIS).  Doc. No. 138-7, pages 10-20.  There is no indication that either Kennedy or Jones ever responded to Chestang's grievances, or had direct knowledge of Chestang's medication issues.  Both Kennedy and Jones have filed affidavits stating they have no recollection of Chestang, did not respond to grievances or informal resolution requests, did not review EOMIS, and did not respond to his claims.  Doc. Nos. 138-4 & 138-5.  Chestang also conceded that he did not really even know

who Kennedy and Jones are.  Doc. No. 138-7, page 18.  In essence, Chestang is alleging Kennedy and Jones "should have known" his medication had run out, because they had access to his electronic medical file.  That, however, is insufficient to establish a constitutional violation.  *See Spruce v. Sargent*, 149 F.3d 783, 786 (8th Cir. 1998)("should have known" standard not sufficient to support a finding of deliberate indifference).

Chestang testified that his claim against Iko is that he saw her twice during the relevant time, and Iko failed to take corrective action when he told her he was having difficulty getting his medications.  Doc. No. 138-7, pages 20-22.  Medical records indicate that Chestang's encounters with Iko both occurred after August 30, 2014.  Doc. No. 138-2, pages 5-12.  Chestang first saw Iko on September 1, 2014, when Chestang was called to the infirmary because of an abnormal EKG which showed Wolff-Parkinson-White (WPW) syndrome.[5]  Iko noted the seriousness of WPW, and completed a consult request for further cardiac evaluation.  Doc. No. 138-2, pages 5-6.  Iko also instructed Chestang about his treatment, and continued Chestang's blood pressure medication.  Although Iko noted Chestang "has not taken his BP meds today," she documented his denial of any complaints, and there is no reference to any difficulties Chestang was having obtaining his medications.  Chestang saw Iko again on Spetember 8, 2016, for a chronic care visit relating to his hypertension.  Iko noted Chestang voiced no complaints, and that he not had any recent episodes of chest pain or palpitations.  Iko also noted Chestang's cardiology consult had been approved, that his medications were up to date, and she encouraged Chestang to allow blood work, which he had been refusing.  Doc. No. 138-2, page 11.  A few days later, Chestang was seen by two physicians at the Arkansas Heart Hospital, who found his hypertension to be controlled.  Doc. No. 138-2, pages 19-

---

[5]WPW is an abnormality in the electrical functioning of the heart which may cause rapid heart rates. *The Gale Encyclopedia of Medicine*, 5447-5448 (5th ed. 2006).

23.[6]

According to a declaration from Melanie D. Jones, M.D., Iko's treatment decisions were medically appropriate.[7]  Doc. No. 138-3.  Dr. Jones further concluded that there is no medical evidence that Chestang's August 30, 2014, symptoms were caused by his blood pressure, or lack of blood pressure medication, and observed that any number of things could have contributed to his symptoms, particularly in light of Chestang's "relatively normal measurements."  Chestang has failed to produce any medical expert opinion to support his assertion that his symptoms were likely caused by missed medications.  *See Dulany v. Carnahan*, 132 F.3d at 1240.

Moreover, there is no medical evidence any delay in providing the medication had any detrimental impact on Chestang.  Medical records from the day of the event indicate Chestang's blood pressure was 143/88.  Doc. No. 138-2, page 1.  According to Dr. Jones, Chestang's readings were only marginally elevated, and there is no medical evidence his blood pressure caused the symptoms he experienced on August 30, 2014.  Doc. No. 138-3.  Dr. Jones also concluded that she did "not believe he was harmed by failing to receive Aspirin and Atenolol."  Doc. No. 138-3, page 1.  Without expert medical evidence establishing a genuine issue of material fact regarding causation and damages, Chestang cannot escape summary judgment.

The medical defendants' actions do not support a finding of deliberate indifference to a serious medical need, and there is no medical evidence indicating the delay in the provision of blood

---

[6]Wilson Wong, M.D., of the Heart Hospital, did assess WPW,  and recommended a follow-up in six months.  Doc. No. 138-2, page 23.

[7]In his response, Chestang seeks to have Jones' declaration stricken from the record, asserting the medical defendants failed to disclose the existence of Jones' opinion, in violation of FED.R.CIV.P. 26.  However, because Chestang is a prisoner bringing the case without an attorney, this matter is not subject to the disclosure requirements of Rule 26.  *See* FED.R.CIV.P. 26(a)(1)(B)(iv).

pressure medication had any adverse effect on Chestang's prognosis.  Chestang's response fails to create a genuine issue of material fact.  Accordingly, the medical defendants are also entitled to summary judgment.

## IV.  Conclusion

IT IS THEREFORE RECOMMENDED THAT:

1.      Defendants' motions for summary judgment on the merits be GRANTED, and plaintiff KeOndra M. Chestang's complaint be DISMISSED WITH PREJUDICE.  Doc. Nos. 126 & 136.

2.      The Court certify that an *in forma pauperis* appeal taken from the order and judgment dismissing this action is considered frivolous and not in good faith.

DATED this 19th day of January, 2017.

_____
UNITED STATES MAGISTRATE JUDGE